## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LUKE BROWN, individually and on behalf of all others similarly situated, | § § § | |
| *Plaintiff*, | § § § | Civil Action No. 1:24-3807-NRB |
| vs. | § § | JURY TRIAL DEMANDED |
| DOLCE & GABBANA USA INC., a Delaware Corporation, UNXD, INC., a Dubai Corporation, BLUEBEAR ITALIA S.R.L. d/b/a INBETWEENERS, an Italian Corporation, | § § § § § | |
| *Defendants*. | § § | |

### <u>PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT</u>

Plaintiff Luke Brown, individually and on behalf all others similarly situated, by his undersigned attorneys, allege violations of the federal securities laws against Defendants Dolce & Gabbana S.R.L., Dolce & Gabbana USA Inc., UNXD, Inc., and Bluebear Italia S.R.L. d/b/a inBetweeners (the "Complaint"), based on personal knowledge about his own acts, and upon information and belief based on facts obtained through investigation conducted by his counsel, which included, among other things: (a) documents and solicitation materials made by Defendants; (b) public statements made by Defendants concerning Dolce & Gabbana cryptocurrency products; and (c) media publications, web blogs, and other web sources concerning Dolce & Gabbana cryptocurrency products.

Despite the public admissions and internal documents already available, Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth here after a reasonable opportunity for discovery. A substantial amount of the facts supporting the allegations contained here are known only to Defendants or are exclusively within their control.

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................4

II.     NATURE OF ACTION ........................................................................................5

III.    SUBJECT MATTER JURISDICTION AND VENUE.....................................9

IV.     BACKGROUND ON DIGITAL ASSETS, CRYPTOCURRENCY, AND NFTS.....10

V.      MISNOMER / ALTER EGO ............................................................................12

VI.     PRINCIPAL-AGENT LIABILITY .................................................................13

VII.    PARTIES .............................................................................................................14

    A.  PLAINTIFF ..........................................................................................................14
    B.  DEFENDANTS......................................................................................................14

VIII.   FACTUAL ALLEGATIONS ............................................................................16

IX.     CLASS ACTION ALLEGATIONS...................................................................24

X.      CAUSES OF ACTION ......................................................................................28

    A.  COUNT ONE: FRAUD.........................................................................................28
    B.  COUNT TWO: EXPRESS BREACH OF CONTRACT .......................................29
    C.  COUNT THREE: IMPLIED BREACH OF CONTRACT ....................................31
    D.  COUNT FOUR: UNJUST ENRICHMENT ..........................................................32
    E.  COUNT FIVE: NEGLIGENCE.............................................................................33
    F.  COUNT SIX: FRAUDULENT MISREPRESENTATION ...................................34
    G.  COUNT SEVEN: VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y.
        GEN. BUS. LAW § 349)......................................................................................35
    H.  COUNT EIGHT: FALSE ADVERTISING UNDER THE CALIFORNIA FALSE ADVERTISING
        LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*)....................................37
    I.  COUNT NINE: FALSE VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT (CAL.
        CIV. CODE § 1750, *ET SEQ.*)...........................................................................40

J.   COUNT TEN: UNLAWFUL, UNFAIR, OR FRAUDULENT BUSINESS PRACTICES UNDER THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) ................................................................................................... 43

K.   THE EXCHANGE ACT CLAIMS ............................................................... 44

SCIENTER ........................................................................................ 44

LOSS CAUSATION ............................................................................ 45

APPLICATION OF PRESUMPTION OF RELIANCE:  FRAUD-CREATED-THE MARKET DOCTRINE ....................................................................... 45

NO SAFE HARBOR ........................................................................... 46

L.   COUNT ELEVEN: VIOLATION OF SECTION 10(B) AND SEC RULE 10B-5(B). ...................... 47

M.   COMMODITIES CLAIM .......................................................................... 50

N.   COUNT TWELVE: COMMODITY POOL FRAUD IN VIOLATION OF SECTIONS 4O AND 22(A) OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 6O, 7 U.S.C. § 25(A)(1). .............. 50

**XI.   DAMAGES** ............................................................................................ **51**

**XII.   PUNITIVE DAMAGES** ........................................................................ **52**

**XIII.   ATTORNEY'S FEES** ............................................................................ **52**

**XIV.   INCORPORATION OF PARAGRAPHS** ............................................... **52**

**XV.   PRAYER FOR RELIEF** ........................................................................ **52**

## I.    INTRODUCTION

1.    This is a class action lawsuit against companies caught up in the "crypto" craze. Defendants sold digital assets that were secured with an underlying promise that was never delivered. The assets did not have characteristics, uses, or benefits Defendants advertised and promoted. Either through reckless incompetence or greed, Defendants failed to deliver what they promised in exchange for purchasing their digital assets and abandoned their crypto project while retaining over $25 million used to fund the project.

2.    Using the "Dolce & Gabbana," brand begun and owned by Defendant Dolce & Gabbana S.R.L. and its alter-ego Dolce & Gabbana USA Inc. (jointly "Dolce & Gabbana), Defendants jointly created and marketed the "DGFamily"—a digital asset project using the brand's popularity—which was used to sell digital assets that would supposedly secure a set of benefits. Such benefits were allegedly "high value" and supposed to be delivered "over an extended period of time" of two years at a rate of once per quarter. The benefits of buying Defendants' digital assets were promoted as including a combination of eight either: (i) digital wearables (digital outfits available for use in a metaverse application called Decentraland), (ii) physical clothing from Dolce & Gabbana, and/or (iii) live events that purchasers of multiple boxes could attend. The digital assets at issue are Non-Fungible Tokens ("NFTs"), as discussed below—a form of digital assets that can be purchased, sold, and transferred on other cryptocurrency markets, such as the Ethereum blockchain here.

3.    Ultimately, Defendants failed to provide the complete set of benefits they promised Plaintiff, and all others similarly situated, and are liable for failing to deliver the benefits it promised its secured customers. Defendants never provided a complete set of products Plaintiff secured through his purchases of digital assets, despite repeatedly promising him the products would be delivered, while inevitably continuing to push back the delivery date.

4.     Defendants misrepresented the status of their NFT project to entice Plaintiff, its investors, and the public into investing into DGFamily, and then failed to provide a complete set of benefits as promised, failed to support the DGFamily community as promised, and manipulated the initial and resale markets for the digital assets they sold.

## II.     NATURE OF ACTION

5.     This action is brought on behalf of a class consisting of all persons and entities who purchased digital assets from Defendants' NFT project ("DGFamily Products") from April 24, 2022, or the initial transfer of DGFamily Products, whichever date is earlier, through the original filing date of this suit, inclusive (the "Class"). The Class comprises three subclasses: (1) all persons and entities who purchased DGFamily Products directly from Defendants, or the platform Defendants used for sale, on their public release date; (2) all persons and entities who purchased DGFamily Products directly from Defendants during the class period; and (3) all persons and entities who purchased DGFamily Products on the open market during the class period as a result of Defendants' successfully soliciting DGFamily Products. This action seeks to recover damages for Plaintiff and proposed Class members' claims, which are brought under common law, state consumer statutes, and violations of federal law, including federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by SEC, against Defendants.

6.     Among common law and state consumer claims, this action alleges Exchange Act violations of Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5]; and violations of Section 20(a) [15 U.S.C. § 78t(a)] against Defendants (the "Exchange Act Claims").

7.     Defendants never had a right to solicit investments from the public related to DGFamily Products. The DGFamily Products were created to serve as a fraudulent vehicle solely

to enrich Defendants' founders, promoters, managers, and affiliates. Without Defendants' fraudulent conduct and misrepresentations, DGFamily Products could not have been offered and sold to investors at any price.

8.      Defendants promoted DGFamily Products online as a "a slate of digital, physical, and experiential benefits." This led to thousands of people purchasing said fraudulent security products. Defendants also manipulated the price of DGFamily Products by using their investors to buy DGFamily Products to illegally drive up their price—before Defendants still failed to deliver 75% of what they promised.

9.      The complete set of benefits promised in exchange for purchasing DGFamily Products were never released. Defendants manipulated the digital currency market for DGFamily Products to their advantage by executing a "rug pull," which is a colloquial term used to describe a scheme in which an NFT developer solicits funds from prospective NFT purchasers promising them certain benefits. Once the purchasers' funds are used to purchase the NFTs, the developers abruptly abandon the project and fail to deliver the promised benefits all while fraudulently retaining the purchasers' funds.

10.     As part of Defendants' NFT scheme, Defendants marketed DGFamily Products to purchasers by falsely claiming that, in exchange for transferring cryptocurrency to buy a DGFamily Product, purchasers would later receive benefits, including, among other things, digital rewards, physical products, and exclusive access to events, along with the support of an online ecosystem to use and market DGFamily Products. After selling their DGFamily Products, Defendants, transferred millions of dollars' worth of purchasers' cryptocurrency to, among other places, wallets controlled by Defendants.

11.     Defendants' unlawful solicitations, offers, and sales of unregistered securities as

DGFamily Products are violations of the Securities Act of 1933 (the "Securities Act") Sections 5 [15 U.S.C. § 77e(a)(1)], 12(a)(1) [15 U.S.C. § 77l(a)(1)], and 15(a) [15 U.S.C. § 77o(a)]. Defendants' public offer and sale of DGFamily Products was an unlawful offering of unregistered securities for which no exemption from registration was available under the Securities Act.

12.    The public sale of DGFamily Products was a clear offer and sale of securities because, among other things, Defendants touted, and Plaintiff and other purchasers were conditioned to expect, and did reasonably expect, that the holder of DGFamily Products would receive more than the Ethereum (ETH) or other virtual currencies invested.

13.    The Securities Act's registration requirements are designed to protect investors by ensuring they are provided adequate information on which to base their investment decisions. Without registration, issuers of securities may market their securities with no disclosure requirements whatsoever. For example, an issuer could omit any information that would make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines), peddle its securities using unbounded exaggerations regarding the progress of its product development and business plan, or even fabricate the existence of merchandise drops supporting the digital products, as was the case here.

14.    Because of the varied and innumerable ways for investors to be, and are likely to be, manipulated and harmed without the protections of the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security. As detailed here, Defendants' public offers and sales of DGFamily Products, were most likely offers and sales of unregistered securities. Defendants are thus strictly liable under Section 12(a)(1) of the Securities Act.

15.    The Exchange Act Claims are based on Defendants' fraudulent and manipulative

scheme to enrich themselves by issuing false and materially misleading statements about DGFamily Products, including their value and the benefits from owning DGFamily Products, and that Defendants were actively supporting the DGFamily project or its online ecosystem.

16.    Defendants' false and materially misleading statements appeared in press releases, their websites, online chat rooms or forums, white papers, postings on social media websites such as Twitter, promotional videos posted on websites such as YouTube, internet podcast interviews and other materials relating to Defendants or DGFamily Products, which were disseminated widely to the investing public.

17.    Each of Defendants' misrepresentations and omissions were material because they were designed to, and did, entice the public into purchasing unregistered securities (DGFamily Products) which were barely more than a vehicle for Defendants' enrichment. As detailed below, when the magnitude of Defendants' failure to provide the benefits promised and support the project were revealed, the trading price of DGFamily Products plummeted.

18.    Plaintiff alleges Defendants acted with scienter in connection with their claims under the Exchange Act. Proof of Defendants' scienter comes, in part, from messages and public releases between and from Defendants. These show, among other things, that DGFamily was a fraudulent scheme since its inception, DGFamily Products always have been patently worth less than the value given, and that no investor would have purchased any DGFamily Products absent Defendants' fraudulent acts.

19.    Plaintiff and others similarly situated deserve redress from Defendants for their fraudulently promoting and selling products that did not provide the return on investment advertised, failing to support the DGFamily project, and manipulating the price of the DGFamily Products. Defendants operated this fraudulent venture to exploit and steal from Plaintiff and other

customers who trusted Defendants' false representations. As a result, Defendants defrauded Plaintiff and thousands of other consumers, and unjustly enriched themselves by profiting off Plaintiff and others without delivering on their promises.

20.     Today, investors in DGFamily Products have little to show for their investments. For these reasons, Plaintiff on behalf of themselves, and all similarly situated investors, seeks compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments made to buy DGFamily Products during the class period, and the right to secure and conserve such funds until repayment.

### III.    SUBJECT MATTER JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), under Section 22 of the Securities Act [15 U.S.C. § 77v] because Plaintiff allege violations of Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)], and under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because Plaintiff allege violations of Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)]. In connection with the acts, conduct and other wrongs alleged here, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications and the internet.

22.     The Court has personal jurisdiction over each of Defendants because each either conducted business in and/or maintained operations in this District and has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District under Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391 because the claims asserted arose in this district; a substantial part of the activities, conduct, and/or damages giving rise to the claims occurred in this district;

Defendants have substantial contacts with this district; and Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District..

## IV.    BACKGROUND ON DIGITAL ASSETS, CRYPTOCURRENCY, AND NFTs

24.    A "cryptocurrency" is a digital or "virtual" currency circulated over the internet as a form of value. Cryptocurrencies are created, and their transaction records are verified and maintained, by a decentralized system using cryptography, rather than through a centralized authority like a bank or government. Like traditional fiat currency, there are multiple types of cryptocurrencies—*e.g.*, Bitcoin, Ethereum, and Binance Tokens. Due to its decentralized nature and limited regulation, cryptocurrency users can transfer funds over the blockchain more anonymously compared to traditional banking and credit systems.

25.    Cryptocurrency owners typically store their cryptocurrency in digital "wallets," which are identified by unique electronic "addresses." Wallets allow cryptocurrency users to store multiple cryptocurrencies and retrieve their digital assets. Each digital wallet has a unique cryptographic address, which is used to facilitate transfers of cryptocurrency between wallet addresses.

26.    These types of cryptocurrency transactions are completed using (1) a "public key," which is akin to a bank account number or public-facing email address, and (2) a corresponding "private key," which is akin to a bank 4-digit PIN or email password that allows a user the ability to access and transfer value or information stored at the public address. Users may transfer cryptocurrency to the public address represented as a case-sensitive string of letters and numbers, 26 to 36 characters long. Each public address is controlled and/or accessed using a unique corresponding private key. Only the holder of an address's private key can authorize transfers of cryptocurrency from that address to another cryptocurrency address. A user may control multiple

public blockchain addresses simultaneously.

27.    Each cryptocurrency transaction, regardless of the cryptocurrency denomination, is recorded on a "blockchain," which acts as a public accounting ledger. Unlike a traditional bank's ledger, the transactions reflected in a blockchain are distributed across many participants that, together, form a network. For each cryptocurrency transaction on a blockchain, the blockchain public ledger records, among other things, the following transaction details: the date and time; the unique cryptocurrency addresses involved in the transaction, including the addresses of the sending, and receiving parties, and the amount of cryptocurrency transferred.

28.    The blockchain does not identify the parties who control the cryptocurrency addresses involved in each transaction. But because each cryptocurrency address is unique, anyone can review other transactions recorded on the blockchain related to the transfer and trace the flow of cryptocurrency. Tracing cryptocurrency to a particular user can be complicated, however, by a user's reliance on multiple cryptocurrency addresses to transfer funds or the use of "mixers," which, in practice, can obscure the link between the sender and receiver of transferred cryptocurrency by commingling cryptocurrencies from multiple transferring parties into a pool before sending specific amounts on to an intended recipient.

29.    An NFT is a unique digital item that is recorded on a blockchain and cannot be copied, substituted, or subdivided. In other words, each NFT is a one-of-a-kind digital item. NFTs can also be transferred on the blockchain. Many NFTs exist as part of the ETH blockchain. Like cryptocurrencies, NFTs are uniquely identifiable on the blockchain. Once minted, an NFT can no longer be edited, modified, or deleted.

30.    NFTs can be created in multiple forms, but one of the main types of NFTs is an image data file like a .jpeg image file. Yet unlike a .jpeg image file, the NFT provides the owner

with an electronic image and corresponding certificate of ownership. NFTs can also act as a "utility" token, allowing an NFT owner to access reward programs, giveaways, and access to other digital assets through their NFT ownership.

31.    NFTs are created through a process known as "minting" and relies on the use of a "smart contract." A smart contract is a piece of computer code that runs on a blockchain. In simple terms, a smart contract is a program that automatically executes defined tasks when and if certain conditions are met. A smart contract system often follows "if . . ., then . . ." statements. For example, a smart contract might be coded to release electronic currency to a party automatically after an agreed-upon event without the need for further action by either party to the contract. The minting of NFTs relies on smart contracts to govern the creation, sale, and any later transfers of the NFTs after minting. NFT smart contract code is publicly viewable on the blockchain.

## V.    MISNOMER / ALTER EGO

32.    In the event any parties are misnamed or are not included here, it is Plaintiff's contention that such was a "misidentification," "misnomer," and/or such parties are/were "alter egos" of parties named here. "Alter ego liability exists when a parent or owner uses the corporate form to achieve fraud, or when the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own." *OOO v. Empire United Lines Co.*, 557 F. App'x 40 (2d Cir. 2014), as corrected (Feb. 7, 2014). A party seeking to pierce the corporate veil under New York law and hold another entity or individual liable on a claim against a corporation must show: (1) the alleged alter ego "exercised complete domination over the corporation with respect to the transaction at issue; and (2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil." *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp., LLC*, 268 F.3d 58, 63 (2d Cir.2001). Plaintiff contends that such "corporate

veils" should be pierced to hold such parties properly included in the interest of justice.

33.    Plaintiff alleges Dolce & Gabbana USA Inc. is the alter-ego of its parent corporation Dolce & Gabbana S.R.L. and they operate as a joint entity because (a) Dolce & Gabbana USA Inc. functions at the absolute direction of Dolce & Gabbana S.R.L. in conducting their business of designing, producing, and marketing luxury clothing and accessories, (b) all of the business of Dolce & Gabbana USA Inc. and Dolce & Gabbana S.R.L. is directed by their shared CEO Alfonso Dolce, (c) prices for goods by Dolce & Gabbana USA Inc. and Dolce & Gabbana S.R.L. are determined by their shared CEO Alfonso Dolce, (d) the corporate formalities between Dolce & Gabbana USA Inc. and Dolce & Gabbana S.R.L. are rarely followed, if at all, and the entities only present themselves as "Dolce & Gabbana" to the public (e) the capitalization of Dolce & Gabbana USA Inc. is established at the sole direction and whim of Dolce & Gabbana S.R.L., (f) Bloomberg describes the USA entity is operating as merely the online store for Dolce & Gabbana products, (g) the Dolce & Gabbana website is listed as owned by the Italian entity but uses the American ".com" domain, as does its customer service email, (h) the Dolce & Gabbana website lists jobs for all Dolce & Gabbana entities, and (i) their shared CEO Alfonso Dolce publicly refers to Dolce & Gabbana's plans in the United States as part of the Italian fashion house's direct business—singularly referring to Dolce & Gabbana for all of their business activities.

34.    Defendants Dolce & Gabbana USA Inc. and Dolce & Gabbana S.R.L. are effectively the same company and are treated as such throughout the remainder of the Complaint besides to delineate which employees of each entity are already known to be involved in the scheme and their relevant jurisdictional information.

## VI.    PRINCIPAL-AGENT LIABILITY

35.    All allegations here of acts or omissions by Defendants include, but are not limited

to, acts and omissions of such Defendants' officers, directors, operators, managers, supervisors, employees, affiliates, subsidiaries, vice-principals, partners, agents, servants, and owners. Plaintiff alleges that such acts and omissions were committed or made with express and/or implied authority of Defendants or were ratified or otherwise approved by the same Defendants; or otherwise, that such acts or omissions were made in the routine, normal course of the actor's employment or agency, and within the scope of the agency or employment.

## VII.　　　PARTIES

**A.　PLAINTIFF**

36.　　Plaintiff Luke Brown, resident of Culver City, California, invested six thousand ($6,000) purchasing DGFamily Products on April 24, 2022. Brown lost a total of five-thousand eight-hundred dollars ($5,800).

**B.　DEFENDANTS**

37.　　Defendant Dolce & Gabbana S.R.L. is a company formed under the laws of Italy with a registered office at Via Carlo Goldoni 10, 20129 Milan, Italy. Upon information and belief, Dolce & Gobbana S.R.L. owns Defendant Dolce & Gabbana USA Inc. (jointly, ("Dolce & Gabbana"). Dolce & Gabbana S.R.L. is an international renowned fashion company that i joined into a cryptocurrency related scam with Defendant UNXD.

38.　　Defendant Dolce & Gabbana USA Inc. is a Delaware corporation with its principal place of business at 546 5th Ave, New York City, New York 10036-5000. It does not have a registered agent listed, and instead lists its CEO Alfonso Dolce as the agent for service, to be served at 546 5th Ave, New York City, New York 10036-5000. Mr. Dolce is Domenico Dolce's brother, and Domenico Dolce is one of the founders and owners of Dolce & Gabbana S.R.L.

39.　　Defendant UNXD, Inc. ("UNXD") is a business entity organized and existing under the laws of Dubai in the United Arab Emirates, and, during the relevant period, participated in the

scheme with the other Defendants to defraud Plaintiff and all others similarly situated. Said Defendant was conducting business with the intent for the international distribution and sales of its products into the United States and the State of New York. Its address is Office no. 409, Floor 4, Building 9, Dubai Design District, Dubai, United Arab Emirates. UNXD is alleged to have worked with the other Defendants to perpetuate the scam warranting this lawsuit. The United Arab Emirates is not a party to the Hague Convention and service will need to be carried out by an agent.

40.    Defendant Bluebear Italia S.R.L. d/b/a inBetweeners ("inBetweeners") is a business entity organized and existing under the laws of Italy, and, during the relevant period, participated in the scheme with the other Defendants to defraud Plaintiff and all others similarly situated. Said Defendant was conducting business with the intent for the international distribution and sales of its products into the United States and the State of New York. Their address is: Corso Monforte 7, 20122 Milano, Italy.

41.    For Inbetweeners and Dolce & Gabbana S.R.L. (if it is not found to be the alter-ego of Dolce & Gabbana USA Inc.), Italy is a party to the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters. Service under the Hague Convention is affected through Italy's Central Authority for the Hague Service Convention, the Organe national italien de la Conférence de La Haye de d.i.p. p/a Ministero degli Affari Esteri e della Cooperazione Internazionale, Servizio per gli Affari giuridici, del Contenzioso e dei Trattati, Piazzale della Farnesina, 1, 00135 Rome, Italy. The required documents (two sets): the original English version of Plaintiffs Original Petition and a translation of all documents to be served.

42.    Under New York Business Corporation Law § 307, the secretary of state is also designated as the agent for service of process in New York for Dolce & Gabbana S.R.L.,

inBetweeners, and UNXD because said foreign Defendants are nonresidents who engage in business in New York, but do not maintain a regular place of business in New York, nor have they designated an agent for service of process.

## VIII.    FACTUAL ALLEGATIONS

43.    The alleged NFT scheme was not Dolce & Gabbana and UNXD's first joint venture in the crypto space. In August 2021, Dolce & Gabbana launched their first NFT collection, "Collezione Genesi" in collaboration with UNDX. Defendants' NFT collection sold out relatively quickly for a total of $5.7 million. The largest customers included people and entities known as "Pranksy, Seedphrase, Red DAO, and Boson Protocol." All but Boson Protocol were investors in UNXD.

44.    Upon information and belief, employees from both Dolce & Gobbana S.R.L. and Dolce & Gabbana USA Inc. participated in the alleged NFT scheme. Employees from Dolce & Gabbana S.R.L. who participated include at least Christian Barbujani, the Global Innovation Manager; Davide Sgherri, Head of New Media; Davide Veneri, Head of Global Retail Sales; and Simone Pezzo, Web3 and AI Innovation. Domenico Dolce, the CEO of both Dolce & Gobbana S.R.L. and Dolce & Gabbana USA Inc., lauded the project upon announcement, while Simone Marchetti, a Merchandising Director ostensibly employed by the Italian entity but operating out of the New York office throughout at least the relevant period, supported the project and communicated with investors. Employees from Dolce & Gabbana USA Inc. who participated include at least Ruggero Caterini, Chief Operating Officer at Dolce & Gabbana USA; Sergio Tagliapietra, Vice-President of Information Technology; and Diana Cabanzo, Marketing Vice President. These individuals from both Dolce & Gabbana entities were involved in managing, marketing, and/or designing various parts of the project turned scheme based on their roles. Because Defendants communicated over Discord through company or anonymous accounts, other

employees of each Defendant may be involved.

45.     The success of the "Collezione Genesi" project led Defendants to collaborate on another cryptocurrency project—which is the scheme at issue. On February 20, 2022, UNXD announced the launch of DGFamily Products on Discord, before announcing a collaboration with another fashion company, Valentino. The next month, UNXD announced a $4M raise from "some of the most notable investors in the ecosystem," while in April it announced a collaboration with Pranksy (without revealing he's an investor in UNXD).

46.     That same month, on April 18, 2022, UNXD promoted yet another collaboration with Dolce & Gabbana, this time also including another crypto entity, inBetweeners—before UNXD had even released the DGFamily Products. UNXD then appeared to go back to focusing on DGFamily Products, as shown via a Twitter announcement on April 22, "[w]e'll soon reveal some of the very special collectors, builders, and investors that are participating in the exclusive Platinum Box private sale for the UNXD x @DolceGabbana DGFamily collection, priced at 40 ETH. An incredible array of 50+ people that we respect and admire." ETH, a widely used digital currency, was worth around $3,000 from April 22 to April 24, 2022, which made the price for a Platinum Box around $120,000.

47.     Two days later, on April 24, 2022, Dolce & Gabbana and UNXD began selling their DGFamily Products for at least 1.224 ETH, which bought a Glass Box, or a maximum of 40 ETH for a Platinum Box. The Glass Box was intended to be "revealable" on a certain date, which would transform it into a Black Box (lowest tier rewards/same as unrevealed Glass), a Gold Box (middle tier rewards), or a Platinum Box (highest tier rewards).

48.     Despite selling all 5,000 units, only some of the DGFamily digital assets were delivered to their customers/investors that day. Dolce & Gabbana and UNXD failed to deliver the

NFTs to all the owners of the 5,000 boxes who attempted to activate (or "mint") said boxes on the date promised.

49.     It later emerged their failure to deliver was because they had not built a smart contract to distribute DGFamily Products after each box was activated, or "minted," but instead transferred the DGFamily Products out one at a time. Despite the inefficiency of this process, noted by the community, and Dolce & Gabbana and UNXD's promise to support their community, UNXD continued with that inefficient process until April 26, 2022. At that point, UNXD finally stopped sending each out on a one-by-one and began sending rewards out in batches—though the process was still not automated.

50.     On April 29, 2022, after the initial process struggles, UNXD tweeted a rough timeline for the project that included the following deadlines:

> ~2 weeks (May 13-ish): glass box reveal
>
> ~2 weeks after that (May 27-ish) Disco Drip drop of metaverse wearables
>
> ~2 weeks after that (June 10-ish): "a capsule collection of digital+physical pieces designed by Domenico Dolce and Stefano Gabbana. T-shirts, hoodies, and sneakers not available anywhere else. You can trade the NFT before redemption. There will be a burn + replace mechanism.

51.     Despite such promises, Dolce & Gabbana and UNXD again failed to deliver. On May 16, UNXD held a virtual town hall with DGFamily Product customers/holders/investors to discuss Defendants' failure to deliver the box reveal to all investors. Dolce & Gabbana and UNXD then began using looser language regarding the date of the first event—saying they "expected to start [revealing the boxes] on Saturday, May 21st." On May 20, Dolce & Gabbana and UNXD announced the first set of in-person events and extended invitations to investors of a certain status—exciting investors.

52.     That excitement quickly waned when the DGFamily Products' capabilities were

not enabled until May 27, 2022, which was, though previously unknown to investors, a day after Dolce & Gabbana and UNXD's NFTs were finally accepted onto the marketplace. UNXD blamed that delay on a critical bug that would allegedly allow technical minded people to see the potential value of each unrevealed box—instead of its and Dolce & Gabbana's own failures.

53.    With investor discontent already brewing, UNXD announced the first of the eight benefits, or the first drop, on June 10, 2022, which was 13 days after they had originally promised to release it. The first drop finally released on June 17, about 20 days overdue and consisted of digital outfits that could be used only in a metaverse platform with barely any users, called DecentraLand.

54.    Yet the first drops were not even usable in DecentraLand until 11 days later as Dolce & Gabbana and UNXD had failed to get approval from DecentraLand's management before releasing said drops. Dolce & Gabbana and UNXD did not ensure these products were usable before distribution. When customers complained to Dolce & Gabbana, its employee responded with a generic email:



.

55.    Concurrently, Dolce & Gabbana and the other Defendants were celebrating the error-ridden release of their NFT project with a party in New York City, the location of Dolce &

Gabbana USA's headquarters in the United States, on June 22, 2022. On information and belief, Trey Songz and other celebrities Berks, Ogden, Blond:ish, and Pavi were paid to attend—as their appearances are visible in photos from the event.

56.    The second drop occurred on July 30, 2022, when Dolce & Gabbana and UNXD sent passes to order Dolce & Gabbana clothing to investors—around 50 days overdue. One of the original and largest investors, Seedphrase, is placed in charge of marketing that is paid at an unknown pay structure.

57.    Generously estimating the value of the drops, each drop sells for around $20-$30. Each investor was given 2 out of 8 secured items, making the two drops a DGFamily Product holder worth around $50 based on an around $3,600 investment. Though some investors with multiple DGFamily Products got additional pieces, the pieces were not valued much higher than any other drop and did not fulfill the project's obligations.

58.    Continuing to feel the pressure, on August 3, 2022, UNXD scrub their old notes and guidance online and switch tact. Trying to restore their consumers' confidence, Dolce & Gabbana and UNXD encouraged their community to buy more DGFamily Products as, "[they had] more big things coming."

59.    As of October 1, 2022, the value of DGFamily Products on a secondary market was once again very poor. Total value accrued from one box minted for around $3,600 currently stands at around $200 with Drops 1 and 2 combined.

60.    On December 8, 2022, UNXD and Dolce & Gabbana announced inBetweeners—who previously produced a project currently under intense scrutiny for scamming one of its own holders—would help with the project.

61.    At the next release, because the project was publicly failing, inBetweeners began

to buy their own assets on the secondary to create false volume (presumably) to entice people to buy.

62.     On January 25, 2023, UNXD pledged to hold one Town Hall per month, after investors complained that Defendants had been avoiding the community for months at a time. At the same time, UNXD stated:

> Dolce&Gabbana is 100% involved in every aspect of the project. They are here in the Discord, and they are absolutely aware of the current sentiment. And yes, we are also aware that there are areas of improvement, which we are acknowledging and working on
>
> …
>
> … Dolce&Gabbana and UNXD are full partners in this.



63.     On February 21, 2023, UNXD marketed "Project ID"—which they described as a profile picture project which will revolutionize Web3, a blockchain based system. One week later, UNXD announced "Messana"—the new name for Project ID—and stated, the "Realtà Parallela collection will begin shipping in early April,"—a full 8 months after it was promised.

64.     Attempting to follow through, on March 11, 2023, March 12 was announced as the last day for the community to send in designs for a third drop, entitled "Future Rewind" (FR). FR was another digital drop like the first drop, but the designs were supposed to be created by the community. Winners were announced March 31.

65.     On April 4, 2023, inBetweeners attempted to charge hidden fees to Defendants' investors/customers, and UNXD announced that Dolce & Gabbana would be covering the cost. That was perhaps the only positive move made on that project in 18 months, and it was merely worth 10 Euros to each holder.

66.     By April 27, 2023, the Realtà Parallela drop had still not shipped out, despite early April being the deadline. UNXD claimed all production has been completed and shipping has been running for two weeks, despite most investors/customers denying they have received anything.

67.     Defendants had failed to respond to its investors/customers' concerns and fulfill their obligations to Plaintiff and those similarly situated. On May 19, 2023, UNXD announced, in contravention to its earlier statement, that Realtà Parallela drops were "arriving around the world." Many investors/customers still denied ever receiving their Realtà Parallela drops. Those holders were advised to contact Dolce & Gabbana to resolve any issues via email, and said emails were ignored for many months.

68.     The last substantive update from Defendants occurred on June 5, 2023. UNXD reassured Defendants' investors/customers that sneakers were being shipping out—despite most

investors/customers still denying that they received them. Those who were fortunate enough to receive the drop sometimes encountered issues with having to pay triple digit bills in USD for duties/custom charges, though Defendants claimed they would cover these costs. It's unknown how many people have been successful with reclaiming this money, but this was another example of Defendants ignoring communications.

69.    Defendants' scheme caused damages to Plaintiff and other consumers. Defendants knew consumers like Plaintiff would be convinced to buy their products by Defendants' false representations of providing eight drops of different products.

70.    On information and belief, Defendants made the business decision to forgo an expensive and time-consuming process to complete the DGFamily project or support it, and instead deliberately undertook a scheme to defraud Plaintiff and other consumers. Defendants admitted the project has regrettable elements and a refund is unfeasible:

**Subject:** R: Official Complaint & Refund request
**Date:**    Wednesday, February 14, 2024 at 4:42:18 AM Central Standard Time
**From:**    Simone Pezzo <Simone.Pezzo.ext@dolcegabbana.it>
**To:**
**CC:**    Davide Sgherri <Davide.Sgherri@dolcegabbana.it>, dg@unxd.com <dg@unxd.com>, Customer Care <customer.care@dolcegabbana.it>

Dear

Good morning. We express our regret upon reviewing your correspondence, and we extend our gratitude for the patience you have demonstrated over the course of these months. Regrettably, as previously indicated, we are able to dispatch the requested items to you. However, it is currently unfeasible to entertain your request for a refund pertaining to the value of the mint boxes. We will communicate the forthcoming steps to the community soon.

Thank you for your understanding.
Best regards,
Simone

71.    On information and belief, Defendants manipulated the DGFamily Product market. Their standard operating procedure has been to promise products they fail to deliver, before abandoning a project and community they promised to support. Because of these unconscionable

practices, Defendants should disgorge any revenue, profits, or any other gains from their scheme to Plaintiff.

72.    Defendants knew or should have known that they were falsely advertising a non-functional product and that consumers would be deceived by their false representations. Defendants acted with reckless disregard when they made such false representations and are responsible for Plaintiff's damages.

## IX.    CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this action under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of a class tentatively defined as:

**DGFAMILY CLASS:**

**All persons in the United States who purchased DGFamily Products from April 24, 2022, through (at least) the filing date of this lawsuit.**

74.    The Class comprises three subclasses: (1) all persons and entities who purchased DGFamily Products directly from Defendants, or the platform Defendants used for sale, on their public release date; (2) all persons and entities who purchased DGFamily Products directly from Defendants during the class period; and (3) all persons and entities who purchased DGFamily Products on the open market during the class period as a result of Defendants' successfully soliciting DGFamily Products.

75.    Excluded from the class definition are any employees, officers, directors of Defendants, and attorneys appearing here, and any judge assigned to hear this action. Plaintiff reserve the right to modify this class definition as he obtains relevant information.

76.    The proposed class can be identified through Defendants' records and ETH block chain records containing, among other information, the relevant digital currency transactions.

77.    Such data reveals there is around 5000 potential victims based on publicly available

cryptocurrency addresses and, on information and belief, they are mostly located in the United States. Accordingly, the number of Putative DGFamily Class Members is believed to be in the hundreds, rendering the class so numerous that individual joinder of all class members is impracticable.

78.    Plaintiff is a member of the proposed class.

**<u>Commonality</u>**

79.    There are questions of fact common to the Putative DGFamily Class, and those questions predominate over questions affecting any individual Putative DGFamily Class Member. Common questions of fact include but are not limited to:

      a.    Whether Defendants fraudulently promoted investment products, that did not later function as promoted, causing investors/consumers like those in the Putative DGFamily Class to invest in DGFamily Products;

      b.    Whether Defendants fraudulently promoted future products or services, or futures in products or services—products or services Defendants knew would not exist as promoted or at all—causing consumers like those in the Putative DGFamily Class to buy said futures or invest further in DGFamily products;

      c.    Whether Defendants violated their agreement(s) to deliver functional products and breached their agreement(s);

      d.    Whether Defendants knew DGFamily would not be completed when they claimed it would be or was, and made false representations despite that knowledge;

      e.    Whether Defendants had a duty to provide products as promised to their consumers, and if Defendants violated that duty;

      f.    Whether Defendants failed to deliver on its promises to consumers to provide complete products;

      g.    Whether Defendants made any false representations to their investors or consumers, and whether Defendants knew those representations to be false, or whether those assertions were made recklessly and without adequate investigation of their truth or falsity;

      h.    Whether Defendants received revenue from their fraudulent venture, and the amount of that revenue;

      i.    Whether Defendant manipulated the market for DGFamily Products; and

j.      Whether Defendants had a duty not to manipulate the market for DGFamily Products, and whether Defendants violated that duty.

80.      There are questions of law common to the Putative DGFamily Class, and those questions predominate over questions affecting any individual Putative DGFamily Class Member. Common questions of law include but are not limited to:

a.      Whether Defendant's conduct in (1) making false representations about DGFamily Products, (2) failing to provide complete DGFamily Products, (3) selling DGFamily Products as unregistered securities without proper regard for investors, and (4) manipulating the DGFamily Product market, constitute acts of fraud;

b.      Whether Defendant's conduct common to the Putative DGFamily Class has resulted or will result in Defendant being enriched at the expense of Putative DGFamily Class Members, or in Defendant retaining a benefit to the detriment and loss of Putative DGFamily Class Members, in frustration of the fundamental principles of justice, equity, and good conscience, and thus constitutes unjust enrichment;

c.      Whether Defendant's conduct common to the Putative DGFamily Class establishes willfulness, malice, or recklessness, or whether Defendant proceeded with conscious disregard for the rights of others, therefore entitling Putative DGFamily Class Members to punitive damages.

**Typicality**

81.      Typicality. *Fed. R. Civ. P. 23(a)(3).* Lead Plaintiff's claims are typical of the claims of the Putative DGFamily Class Members. Lead Plaintiff would only seek individual or actual damages if class certification is denied. In addition, Lead Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other Members of the Putative DGFamily Class.

**Adequacy**

82.      Adequacy. *Fed. R. Civ. P. 23(a)(4).* Lead Plaintiff is an adequate representative of the proposed Putative DGFamily Class because his interests coincide with and are not antagonistic to, the interests of the other Members of the Putative DGFamily Class he seeks to represent; he has retained counsel competent and experienced in such litigation; and he intends to prosecute this

action vigorously. Lead Plaintiff and their Counsel will fairly and adequately protect the interests of the Members of the Putative DGFamily Class.

**<u>Superiority</u>**

83.    Superiority. *Fed. R. Civ. P. 23(b)(3)*. Questions of law and fact common to the Putative DGFamily Class Members predominate over questions affecting only individual Members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Liability will be determined based on a common set of facts and legal theories. Willfulness and Scienter will be determined based on Defendants' conduct and knowledge, not upon the effect of Defendants' conduct on the Putative DGFamily Class Members.

84.    The damages sought by each Member are such that individual prosecution for a majority of the Members would prove burdensome and expensive given the complex and extensive litigation required by Defendants' conduct—and would be burdensome and expensive on the Federal Judiciary System to resolve multiple litigations based on the same facts as a single class action. It would be almost impossible for Members of the Putative DGFamily Class individually to redress effectively the wrongs done to them. Even if the Members of the Putative DGFamily Class themselves could afford such individual litigation, it would still be an unnecessary burden on the courts.

85.    Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve many individual claims based on a single set of proof in one case.

## X.    CAUSES OF ACTION

### A.    COUNT ONE: FRAUD

86.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth here.

87.    Defendants failed to disclose that the DGFamily Products project was never to be completed as promoted and that they would not be supporting it moving forward.

88.    Defendants have no practice of providing promised products/projects and supporting said projects/products.

89.    This is a signal attribute of fraud because Defendants represented to provide the promoted products/projects and to do what was best for Plaintiff and other consumers. Moreover, in related context and as previously alleged, Defendants had a duty to provide the promoted products/projects and to do what was best for Plaintiff, investors, and other consumers, but chose to proceed in violation of this duty.

90.    Rather than make candid, straightforward disclosure of their material failures, Defendants ignored them.

91.    Plaintiff and other consumers were ignorant of these material failures and did not stand in equal opportunity with Defendants to know they existed. They had no way of knowing what sort of products/projects would be implemented or what contractual terms Defendants injected to immunize their scheme. In this context these purported contractual terms have the added effect of intentionally misleading Plaintiff and other consumers concerning Defendants' practices. These customers cannot reasonably expect that Defendants would take their assets and fail to provide a functional DGFamily Product, fail to support the community, or manipulate the DGFamily Product market. But this is reflected repeatedly in Plaintiff's statements as presented in this Complaint.

B.   **COUNT TWO: EXPRESS BREACH OF CONTRACT**

92.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth here.

93.   Plaintiff alleges that they entered valid and enforceable express contracts or was a third-party beneficiary of valid and enforceable express contracts, with Defendants.

94.   The valid and enforceable express contracts that Plaintiff entered with Defendants include Defendants' representations that they would provide a complete DGFamily Product with eight item drops at the time the DGFamily Products were publicly noticed and/or released for sale. The express contracts also include violations of Defendants' then-current terms of service.

95.   Under these express contracts, Defendants and/or their affiliated contractors or associates, promised and were obligated to: (a) provide a functional version of DGFamily Products, on which the value of DGFamily Products were at least partially dependent; and (b) provide the agreed terms in exchange for Plaintiff's and other consumers investments in Defendants' products/services. In exchange, Plaintiff and other consumers agreed to pay money for these products/services.

96.   Both the (a) provision of a complete DGFamily Product and (b) the obligation that Defendants will strive to do the best for the project and the community of investors/customers in DGFamily Products—among other obligations—were material aspects of these agreements.

97.   Defendants had a duty to provide a functional DGFamily Product, especially if they were taking assets from Plaintiff and other consumers in exchange for access to it. Instead, Defendants pocketed Plaintiff's and other consumers' money and mostly forgot, according to the publicly available information, about the "failed endeavor" until receiving negative attention.

98.   Defendants' express representations—including, but not limited to, express representations found in their advertising and promotion—formed an express oral contract/offer

requiring Defendants to provide a functional DGFamily Product.

99.     Plaintiff trusted Defendants' representations and proposed agreements related to their products. Yet Defendants failed to provide the promoted product and do what was best for their consumers, even lying about the underlying investment in the project. The DGFamily Products are essentially worthless, in part because DGFamily Products were never completed. Plaintiff would not have entered such an arrangement with Defendants without believing DGFamily Products would function and be supported by Defendants.

100.     A meeting of the minds occurred, as Plaintiff and other consumers invested in Defendants digital products in exchange for, among other things, a functioning DGFamily Product and Defendants' support of it.

101.     Plaintiff performed their obligations under the contract when they paid for Defendants' digital products.

102.     Defendants materially breached their contractual obligations to provide a complete DGFamily Product and support the project.

103.     Defendants materially breached the terms of these express contracts, including, but not limited to, the terms stated in their promotions and then-current terms of service.

104.     The ensuing damages were a reasonably foreseeable consequence of Defendants' actions in breach of these contracts.

105.     Because Defendants failed to fulfill obligations promised in these contracts, Plaintiff and other consumers did not receive the full benefit of the bargain, and instead received less than what was promised. Defendants therefore damaged Plaintiff in an amount at least equal to the difference in the value of the DGFamily they paid for, and the value they were left with.

106.     Had Defendants disclosed that DGFamily Products were nonfunctional, or that they

were not going to support the project, neither Plaintiff nor any reasonable person would have purchased/invested in Defendants' products/services.

107.   As a direct and proximate result of these breaches, Plaintiff has been harmed and suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the loss of assets and loss of use of those assets, out-of-pocket expenses, and the loss of the benefit of the bargain he had struck with Defendants.

108.   Plaintiff is entitled to compensatory and consequential damages suffered because of these breaches.

**C.     COUNT THREE: IMPLIED BREACH OF CONTRACT**

109.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth here.

110.   When Plaintiff and other consumers provided their investments/monies to Defendants in exchange for Defendants' services and products required to participate in DGFamily Products' drops, they entered implied contracts with Defendants under which Defendants agreed to reasonably provide a complete DGFamily product and support its community.

111.   Defendants solicited and invited Plaintiff and other consumers to invest/pay for their digital products as part of Defendants' regular business practices. Plaintiff accepted Defendants' offers and provided assets to Defendants.

112.   In entering such implied contracts, Plaintiff reasonably believed and expected that Defendants would provide a complete DGFamily Product and support the project.

113.   Plaintiff provided assets to Defendants reasonably believing and expecting that Defendants would provide a complete DGFamily Product and support the project.

114.   Plaintiff would not have provided his assets to Defendants in the absence of the implied contract between himself and Defendants to provide a complete DGFamily Product and

support the project.

115.    Plaintiff would not have entrusted his assets to Defendants in the absence of their implied promise provide a complete DGFamily Product and support the project.

116.    Plaintiff fully and adequately performed his obligations under the implied contracts with Defendants.

117.    Defendants breached their implied contracts with Plaintiff by failing to provide a complete DGFamily Product and support the project.

118.    As a direct and proximate result of Defendants' breaches of the implied contracts, Plaintiff sustained damages as alleged here.

119.    Plaintiff are entitled to compensatory and consequential damages suffered because of these breaches.

**D.      COUNT FOUR: UNJUST ENRICHMENT**

120.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth here.

121.    As a direct and proximate result of Defendants' intentional and unlawful taking of Plaintiff's assets without providing the promised product/services, Plaintiff has been deprived of the profits and other benefits of purchasing/investing in Defendants' products. Defendants have been unjustly enriched by its wrongful receipt and retention of profits and other benefits they deprived Plaintiff and, in equity, Defendants should not be allowed to retain their revenues and benefits.

122.    Plaintiff is entitled to a judgment requiring Defendants to disgorge all sums they have received as revenue and other benefits arising from their unconscionable and unlawful failure to provide a complete DGFamily Product, failure to support the project, and manipulation of the DGFamily Product market.

E.    <u>COUNT FIVE: NEGLIGENCE</u>

123.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth here.

124.    By representing to the public that the DGFamily Products would be complete and that the DGFamily community would be supported, Defendants had a duty of care to use reasonable means to provide the promised products/services, not manipulate the DGFamily Product markets, and support Plaintiff and the other members of the DGFamily community.

125.    Defendants' duty of care to provide the promised products/services, not manipulate the DGFamily Product market, and support Plaintiff and the other members of the DGFamily community arose from the special relationship that existed between Plaintiff and Defendants. Defendants were positioned to ensure that the promised products/services would be delivered, that the DGFamily Product market was not manipulated, and to support Plaintiff and the other members of the DGFamily community.

126.    Defendants breached their duties, and thus were negligent, by failing to provide the promised products/services, failing to support Plaintiff and the other members of the DGFamily community, and manipulating the DGFamily Product market. The specific negligent acts and omissions committed by Defendants include, but are not limited to:

a.    Promoting products or services, that did not exist as promoted, causing Plaintiff to buy said products or services under false pretenses;

b.    Representing that DGFamily Product would be completed and making false representations despite that knowledge;

c.    Willfully failing to provide complete products and services to their consumer, even after receiving revenues from their fraudulent venture;

d.    Willfully manipulating the market for DGFamily Products; and

e.    Willfully failing to support Plaintiff and the DGFamily community.

127.     It     was     foreseeable     that     Defendants'     failures     to     provide     the     promised products/services, not manipulate the DGFamily Product market, and support Plaintiff and the other members of the DGFamily community would result in one or more types of damages and/or injuries to Plaintiff and those similarly situated.

128.     Plaintiff is entitled to compensatory and consequential damages suffered because of Defendants' negligent failures.

## F.     COUNT SIX: FRAUDULENT MISREPRESENTATION

129.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth here.

130.     Defendants fraudulently represented to the public that their DGFamily Product would be complete and that they would be supporting the project and the DGFamily community.

131.     Upon information and belief, Defendants knew that DGFamily would never be completed and that they had no intention of supporting the project or the DGFamily community, including Plaintiff.

132.     Defendants had a duty to tell its consumers, including Plaintiff, that their DGFamily Product would never be completed and that they had no intention of supporting the project or the DGFamily community.

133.     Rather than make candid, straightforward disclosures to their consumers, including Plaintiff, Defendants willfully concealed that their DGFamily Product would never be completed and that they had no intention of supporting the project or the DGFamily community.

134.     Plaintiff would not have purchased Defendants' products but for his reliance on Defendants' material statements that their DGFamily Product would be completed and that they would be supporting the project and the DGFamily community.

135.     As a result, Plaintiff is entitled to compensatory and consequential damages

suffered because of Defendants' fraudulent representations.

**G.    COUNT SEVEN: VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y. GEN. BUS. LAW § 349)**

136.    Plaintiff brings this count individually and on behalf of Plaintiff and the Class against all Defendants.

137.    Plaintiff and Class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h). Defendants are each a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

138.    The New York Deceptive Acts and Practices Act ("New York DAPA") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce[.]" N.Y. Gen. Bus. Law. § 349. Reliance is not an element as "[r]eliance on the alleged deception is *not* required by either Section 349 or Section 350." *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 394 (E.D.N.Y. 2022) (citing *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015)).

139.    During their business, Defendants, themselves or through their agents, employees, and/or subsidiaries, violated the New York DAPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts about the reliability, safety, and performance of investing in DGFamily or purchasing DGFamily Products, as detailed above, while operating out of New York.

140.    By misrepresenting, failing to disclose, and actively concealing the failure to deliver all eight merchandise drops or properly support the DGFamily community—which negatively affected the value of DGFamily Products held by Plaintiffs and Class members—Defendants engaged in deceptive or practices in the conduct of business, trade, or commerce, and/or in the furnishing practices of any service, as prohibited by N.Y. Gen. Bus. Law. § 349.

141.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to, and did in fact, deceive reasonable consumers, including Plaintiff and Class members, about the true safety and reliability of investing in DGFamily or purchasing DGFamily products, the quality of DGFamily Products, and the true value of DGFamily and its DGFamily Products.

142.    Defendants' scheme and concealment of their failure to develop DGFamily and true characteristics of the DGFamily Products were material to Plaintiff Class members, as Defendants intended. Had they known the truth, Plaintiff and Class members would not have purchased DGFamily Products or would have paid significantly less for them.

143.    Plaintiff and Class members relied on Defendants and had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Class members did not, and could not, unravel Defendants' deception on their own.

144.    Defendants had an ongoing duty to Plaintiff and Class members to refrain from unfair or deceptive practices under the New York DAPA during their business. Defendants owed Plaintiff and Class members a duty to disclose all the material facts related to the failures to deliver all eight DGFamily drops and support the DGFamily community because they possessed exclusive knowledge, they intentionally concealed the failures to deliver all eight DGFamily drops and support the DGFamily community from Plaintiff and the Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

145.    Plaintiff and Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to

disclose material information.

146.    Defendants' violations present a continuing risk to Plaintiff and Class members, as well as to the public. Defendants' unlawful acts and practices complained of herein affect the public interest.

147.    Under N.Y. Gen. Bus. Law § 349, Plaintiff and Class members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under New York DAPA.

**H.    COUNT EIGHT: FALSE ADVERTISING UNDER THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*)**

148.    Plaintiff brings this count individually and on behalf of members of the DGFamily Class who purchased DGFamily Products in California ("California resident Class members") against all Defendants.

149.    Defendants, Plaintiff, and California resident Class members are "persons" within the meaning of Cal. Bus. & Prof. Code § 17506.

150.    The California False Advertising Law ("California FAL") prohibits false advertising. California Bus. & Prof. Code § 17500.

151.    During their business, Defendants, themselves or through their agents, employees, and/or subsidiaries, violated the California FAL by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts related to the reliability, safety, and performance of investing in DGFamily or purchasing DGFamily Products, as detailed above.

152.    By misrepresenting, failing to disclose, and actively concealing the failure to deliver all eight promised DGFamily merchandise drops or support the DGFamily community, affecting the value of DGFamily Products, Defendants engaged in untrue and misleading advertising prohibited by California Bus. & Prof. Code § 17500., including using or employing

deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely on such concealment, suppression, or omission, in connection with advertising DGFamily and selling DGFamily Products.

153.    Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and California resident Class members, about the true safety and reliability of investing in DGFamily or purchasing DGFamily Products, the quality of DGFamily products, and the true value of DGFamily and its DGFamily Products.

154.    Defendants made or caused to be made and disseminated throughout California advertising, marketing, and other publications containing many statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff and California resident Class members. Numerous examples of these statements and advertisements appear in the preceding paragraphs throughout this Complaint, including at least paragraphs 44-63.

155.    Defendants' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and California resident Class members, about the true safety and reliability of investing in DGFamily or purchasing DGFamily Products, the quality of DGFamily products, and the true value of DGFamily and its DGFamily Products.

156.    Defendants' scheme and concealment of their failure to develop DGFamily and true

characteristics of the DGFamily Products were material to Plaintiff and California resident Class members, as Defendants intended. Had they known the truth, Plaintiff and California resident Class members would not have purchased DGFamily Products or would have paid significantly less for them.

157.    Plaintiff and California resident Class members relied on Defendants and had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and California resident Class members did not, and could not, unravel Defendants' deception on their own.

158.    Defendants had an ongoing duty to Plaintiff and California resident Class members to refrain from unfair or deceptive practices under the California FAL during their business. Defendants owed Plaintiff and California resident Class members a duty to disclose all the material facts related to the failures to develop DGFamily and support the DGFamily community because they possessed exclusive knowledge, they intentionally concealed the failures to deliver all eight promised DGFamily merchandise drops and support the DGFamily community from Plaintiff and the California resident Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

159.    Plaintiff and California resident Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

160.    Defendants' violations present a continuing risk to Plaintiff and California resident Class members, as well as to the public. Defendants' unlawful acts and practices complained of herein affect the public interest.

161.    Plaintiff and California State Class members seek an order enjoining Defendants'

false advertising, any such orders or judgments as may be necessary to restore to Plaintiff and California resident Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and any other just and proper relief available under the false advertising provisions of the California FAL.

I.    COUNT NINE: FALSE VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, *ET SEQ.*)

162.    Plaintiff brings this count individually and on behalf of members of the DGFamily Class who purchased DGFamily Products in California ("California resident Class members") against all Defendants.

163.    DGFamily Products are "goods" within the meaning of Cal. Civ. Code § 1761(a).

164.    Defendants, Plaintiff, and California resident Class members are "persons" within the meaning of Cal. Civ. Code § 1761(c).

165.    Plaintiff and California resident Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

166.    The California Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770.

167.    During their business, Defendants, themselves or through their agents, employees, and/or subsidiaries, violated the CLRA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts related to the reliability, safety, and performance of investing in DGFamily or purchasing DGFamily Products, as detailed above.

168.    By misrepresenting, failing to disclose, and actively concealing the failure to deliver all eight promised DGFamily merchandise drops or properly support the DGFamily

community—which negatively affected the value of DGFamily Products held by Plaintiffs and Class members—Defendants engaged in one or more of the following unfair or deceptive business practices as defined in Cal. Civ. Code § 1770(a):

    a.    Representing that DGFamily Products have characteristics, uses, benefits, and qualities which they do not have.

    b.    Representing that DGFamily Products are of a particular standard, quality, and grade when they are not.

    c.    Advertising DGFamily Products with the intent not to sell them as advertised to include all eight merchandise drops.

    d.    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

*See* Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16).

169.    Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and California resident Class members, about the true safety and reliability of investing in DGFamily or purchasing DGFamily Products, the quality of DGFamily products, and the true value of DGFamily and its DGFamily Products.

170.    Defendants' scheme and concealment of their failure to develop DGFamily and true characteristics of the DGFamily Products were material to Plaintiff and California resident Class members, as Defendants intended. Had they known the truth, Plaintiff and California resident Class members would not have purchased DGFamily Products or would have paid significantly less for them.

171.    Plaintiff and California resident Class members relied on Defendants and had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and California

resident Class members did not, and could not, unravel Defendants' deception on their own.

172.    Defendants had an ongoing duty to Plaintiff and California resident Class members to refrain from unfair or deceptive practices under the CLRA during their business. Defendants owed Plaintiff and California resident Class members a duty to disclose all the material facts related to the failures to develop DGFamily and support the DGFamily community because they possessed exclusive knowledge, they intentionally concealed the failures to deliver all eight DGFamily merchandise drops and support the DGFamily community from Plaintiff and the California resident Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

173.    Plaintiff and California resident Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

174.    Defendants' violations present a continuing risk to Plaintiff and California resident Class members, as well as to the public. Defendants' unlawful acts and practices complained of herein affect the public interest.

175.    Defendants were provided notice of the issues raised in this count by consumers throughout the failed scheme. Because Defendants failed to adequately remedy their unlawful conduct within the requisite period, Plaintiff seek all damages and relief to which Plaintiff and California State Class members are entitled.

176.    Under Cal. Civ. Code § 1780(a), Plaintiff and California residents Class members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding actual damages, treble damages, restitution, attorneys' fees, and any other just and proper relief available under the CLRA against Defendants.

**J.    COUNT TEN: UNLAWFUL, UNFAIR, OR FRAUDULENT BUSINESS PRACTICES UNDER THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.)**

177.    Plaintiff brings this count individually and on behalf of members of the DGFamily Class who purchased DGFamily Products in California ("California resident Class members") against all Defendants.

178.    California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."

179.    As detailed in the allegations above, Defendants knowingly and intentionally designed, developed, tested, manufactured, and/or sold DGFamily Products, and marketed and sold those DGFamily Products, while misrepresenting the development of the DGFamily merchandise drops and fraudulently concealing that failure from regulators, Plaintiff, and California resident Class members alike. In doing so, Defendants have engaged in at least one of the following unlawful, fraudulent, and unfair business acts and practices in violation of the UCL:

    a.    Knowingly and intentionally concealing from Plaintiff and California resident Class members that all eight DGFamily merchandise drops would not be delivered, while obtaining money from Plaintiff and California State Class members;

    b.    marketing DGFamily Products as possessing functional use in that they would provide for a series of eight DGFamily merchandise drops, while 6 out of 8 were never delivered, or potentially, created; and/or

    c.    violating both federal and California laws.

180.    Defendants' misrepresentations, concealments, omissions, and suppressions of material facts had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including Plaintiff and California resident Class members, about the true safety and reliability of investing in DGFamily or purchasing DGFamily Products, the quality of DGFamily products, and the true value of DGFamily and its DGFamily Products.

181.    Plaintiff and California resident Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

182.    Under Cal. Bus. & Prof. Code § 17200, Plaintiff and California residents Class members seek an order enjoining Defendants' unfair or deceptive acts or practices, any such orders or judgments as may be necessary to restore to Plaintiff and California State Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §§ 17203, and any other just and proper relief available under the California UCL.

## K.    THE EXCHANGE ACT CLAIMS

183.    In the alternative to the above claims, Plaintiff's Exchange Act claims seek to hold Defendants liable for intentionally (or with deliberate recklessness) issuing false and misleading statements to induce investors to buy DGFamily Products, and/or perpetuating a fraudulent scheme or device upon Plaintiff and the Class.

## SCIENTER

184.    To assess Plaintiff's claims under the Exchange Act, Plaintiff alleges that the above-described material misrepresentations and omissions were made by Defendants either intentionally and/or with reckless disregard for the accuracy for the purposes of: (a) personal financial gain; (b) inflating market demand for DGFamily Products during the public sale and offering of DGFamily Products; and (c) securing additional financing and/or investors.

185.    Defendants were aware of the false claims as explained above. Each of Defendants had actual knowledge that: (i) the DGFamily Products would not be completed, (ii) there was no or de minimis value in DGFamily Products; (iii) there are no benefits from owning DGFamily Products, and (iv) that Defendants were not actively supporting the project, its online ecosystem,

or the completion of their DGFamily Products obligations.

186.    Similarly, because of its position as an owner, and/or its relationship with the other Defendants, Dolce & Gabbana knew or was grossly reckless in not knowing the fabricated, non-existent base security that Plaintiff and the Class were investing in.

## LOSS CAUSATION

187.    During the Class Period, Defendants made false and misleading statements and engaged in a scheme to deceive the market, as well as a course of conduct that artificially inflated the price of Defendants' patently worthless DGFamily Products and operated as a fraud and deceit on the Class by materially misleading the investing public.

188.    These false and/or materially misleading statements concealed the fact that DGFamily Products were nothing but a vehicle for Defendants' self-dealing and personal enrichment.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-CREATED-THE MARKET DOCTRINE

189.    Reliance need not be proven here because the action involves falsities so egregious and pervasive that they go to the very existence of DGFamily Products. Positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the securities are so tainted by fraud as to be unmarketable. In other words, it must be shown that but for the fraud, DGFamily Products would not have been marketable.

190.    DGFamily Products should not have been sold to the investing public as they have always been objectively valueless and unmarketable because there was never a plan to complete the DGFamily Product obligations or other promised owner benefits.

191.    As detailed here, without Defendants' fraudulent conduct, DGFamily Products could not have been sold for any reasonable price, if at all. Further, given that DGFamily Products

were not registered for sale, they were unlawfully offered and thus *per se* unmarketable. Where, as here, actors introduce an otherwise unmarketable security into the market through fraud, they have manipulated all purchasers of the securities.

192.    Plaintiff is thus entitled to the presumption of reliance because all DGFamily Products were offered and sold because of Defendants' brazen fraud and egregious fraudulent conduct.

193.    Further, "[i]t is not ... necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. ... It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *Olson v. Major League Baseball*, 29 F.4th 59, 76 (2d Cir. 2022) (citing *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 951, 64 Cal.Rptr.2d 843, 938 P.2d 903, 919 (1997)). "[A] presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." All of Defendants' statements throughout their scheme led investors to believe the project was ongoing and supported, which were material misrepresentations that show an inference of reliance.

## NO SAFE HARBOR

194.    The statutory safe harbor provided for forward-looking statements in some cases does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

195.    The DGFamily Products at issue were unregistered securities and thus such safe harbors are inapplicable. Furthermore, to the extent some statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

196.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Defendants who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying, or relating to, any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when they were made.

L.    COUNT ELEVEN: VIOLATION OF SECTION 10(B) AND SEC RULE 10B-5(B).

197.    Plaintiff incorporates and re-alleges all preceding paragraphs as if fully set forth here.

198.    This Count is asserted by Plaintiff on behalf of himself and the Class against all Defendants and is based on Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

199.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct that was intended to, and did (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DGFamily Products; and (iii) cause Plaintiff and other members of the Class to buy or otherwise acquire patently worthless unregistered securities, DGFamily Products, at artificially created, and inflated, prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth here.

200.    Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and

(iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiff and the other members of the Class.

201.    Under the above plan, scheme, conspiracy, and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or publication of the promotional materials, press releases and other statements and documents described above, including statements made to the media that were designed to influence the market for DGFamily Products. Such promotional materials, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Defendants' business, the value of DGFamily Products, and the entire scheme.

202.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with a reckless disregard for the truth in that they failed or refused to determine and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

203.    Defendants are liable both directly and indirectly for the wrongs complained of here. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the quality of the DGFamily Product. As companies raising investments from the public, Defendants had a duty to disseminate timely, accurate, and truthful information about their businesses, operations, future financial condition, and prospects. Because of the dissemination of the above false and misleading promotional materials, releases, and public

statements, a public market was created for worthless DGFamily Products. DGFamily Products have no use and no value at all yet Defendants' fraudulent conduct artificially created such a market.

204.    In ignorance of the adverse facts about the non-existence or inviability of the DGFamily Product and Defendants' misrepresentations and concealment of DGFamily Products development conditions, Plaintiff and the other members of the Class bought or otherwise acquired DGFamily Products and were damaged thereby.

205.    Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired any DGFamily Products. At the time of the purchases and/or acquisitions by Plaintiff and the Class, DGFamily Products had no true value and thus Plaintiff and the other members of the Class purchased worthless unregistered securities. The market price of DGFamily Products plummeted upon materialization of undisclosed risks and/or public disclosure of the alleged facts to the injury of Plaintiff and Class members.

206.    Because of the alleged conduct, Defendants knowingly or recklessly, directly, or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

207.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases, acquisitions, and sales of DGFamily Product unregistered securities during the Class Period, upon the disclosure that Defendants disseminated false information concerning essentially every aspect of its operation to the investing public.

**M.**     **COMMODITIES CLAIM**

**N.**     **COUNT TWELVE: COMMODITY POOL FRAUD IN VIOLATION OF SECTIONS 4O AND 22(A) OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 6O, 7 U.S.C. § 25(A)(1).**

208.    Plaintiff incorporates and re-alleges the preceding paragraphs as if fully set forth here.

209.    Plaintiff alternatively seeks relief under Section 4o of the Commodity Exchange Act, entitled "Fraud and misrepresentation by commodity trading advisors, commodity pool operators, and associated person," which provides:

(1)    It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator by use of mails or any means or instrumentality of interstate commerce, directly or indirectly –

(A)    to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B)    to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant. 7 U.S.C. § 6o.

210.    Defendants employed a device, scheme, or artifice to defraud Plaintiff, or engaged in transactions, practices, or a course of business which operated as a fraud or deceit upon Plaintiff in violation of section 4o of the Commodity Exchange Act, by, among other things:

a.    receiving cryptocurrency funds from Plaintiff, failing to complete the DGFamily Product as promised, and converting and/or misappropriating such funds;

b.    providing Plaintiff with misleading statements that misrepresented the development of the DGFamily Product and support for the DGFamily community; and

c.    failing to accurately inform Plaintiff about the status of the DGFamily Product, continuously promising it would be released when it never was, and failing to provide timely account statements, status reports, and updates.

211.    Defendants acted with scienter as shown through the misrepresentations revealed comparing their public and private statements, as well as strong circumstantial evidence of other

conscious misbehavior or recklessness, and that Defendants both had motive and opportunity to commit fraud.

212. Defendants received substantial compensation in exchange for providing DGFamily Products and managing the DGFamily community.

213. Defendants' misrepresentations and/or omissions as alleged herein proximately caused Plaintiff's injuries in the form of loss of funds because of a promised but never completed product under Defendants' control.

## XI.    DAMAGES

214. Plaintiff adopts by reference each foregoing paragraph of the stated in this Complaint as if fully and completely set forth here.

215. Defendants' conduct and actions discussed above proximately caused injury to Plaintiff, which resulted in:

    a.    Loss of use damages for assets diminished by Defendants' actions;

    b.    Actual damages and treble damages under the Consumer Protection Claims;

    c.    Exemplary damages under the Consumer Protection Claims and Common-law Fraud;

    d.    Actual damages, including economic damages under all causes of action;

    e.    As a direct and proximate result of Defendants' breaches of contracts, Plaintiff sustained damages as alleged here;

    f.    Plaintiff is entitled to compensatory and consequential damages suffered because of Defendants' fraud and actions.

    g.    Mental anguish;

    h.    Civil penalties;

    i.    Prejudgment interest;

    j.    Attorney's fees; and

    k.    Costs of action.

216.    Plaintiff further seeks unliquidated damages within the jurisdictional limits of this Court.

## XII.    PUNITIVE DAMAGES

217.    Plaintiff incorporates the foregoing paragraphs of this Complaint as if fully set forth here.

218.    The wrong done to Plaintiff by Defendants was attended by fraudulent, malicious, intentional, willful, wanton, or reckless conduct that evidenced a conscious disregard for Plaintiff's rights. Thus, Plaintiff seeks punitive damages in an amount to be proven at trial.

## XIII.    ATTORNEY'S FEES

219.    Each allegation contained in the foregoing paragraphs is realleged as if fully rewritten here.

220.    Plaintiff is entitled to recover reasonable attorney fees and request the attorney's fees be awarded under his breach of contract claims.

## XIV.    INCORPORATION OF PARAGRAPHS

221.    Every paragraph in this Complaint is incorporated into every other paragraph.

## XV.    PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, awarding relief as follows:

a.    Finding a class action is the most efficient and effective way to resolve the claims against Defendants;

b.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendants' wrongful conduct;

c.    Holding that the doctrine of unjust enrichment applies and ordering Defendants to pay Plaintiff and those similarly situated all sums received by Defendants flowing from their illegal and unconscionable activities;

d.    For an award of actual damages, compensatory damages, statutory damages, exemplary damages, and statutory penalties, in an amount to be determined, as allowable by law;

e.    For an award of punitive damages, as allowable by law;

f.    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

g.    Pre-and post-judgment interest on any amounts awarded; and

h.    Any other relief that this court may deem just and proper.

Respectfully submitted,

*/s/* Alexander G. Kykta

**ELLZEY & ASSOCIATES, PLLC**
Jarrett L. Ellzey (*pro hac vice* forthcoming)
Texas Bar No. 24040864
jarrett@ellzeylaw.com
Leigh S. Montgomery (*pro hac vice* forthcoming)
Texas Bar No. 24052214
leigh@ellzeylaw.com
Alexander G. Kykta
Texas Bar No. 24107841
alex@ellzeylaw.com
1105 Milford Street
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455

Alex P. Clavering
Attorney at Law
NY Reg. No. 5833637
1252 Carlls Straight Path
Dix Hills, NY 11746
alex.clavering@columbia.edu
Phone: (929) 266-3926

**ATTORNEY TOM & ASSOCIATES**
Tom Kherkher (*pro hac vice* forthcoming)
Texas Bar No. 24113389
tom@attorneytom.com
5909 West Loop South Suite 525
Houston, Texas 77401
Phone: (855) 866-9467

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I certify a copy of the foregoing document was filed in accordance with the protocols for e-filing in the United States District Court for the Southern District of New York on September 24, 2024, and served on all counsel of record who have appeared and consented to electronic notification *via* CM/ECF.


/s/*Alexander G. Kykta*
Alexander G. Kykta